May I please the court, Carmen Hernandez on behalf of Alexsi Lopez. I know there are a I know that rule judge, but I have often found that the one I leave out is the one that later may somehow. I understand the rule. It's difficult to adhere to it, Your Honor. So there was a crime in this case in February of 2007. It doesn't get charged until six and a half years later in July of 2013. And then the trial doesn't take place for eight years. The government reason for the delay, and it relies on DNA that was collected. The DNA was collected, the item on which the DNA was collected, was the DNA that was collected. The DNA was found, was collected in 2007, was not sent to the DNA lab until 2011 without real explanation. And therefore, it's that negligence on behalf of the police that delays the DNA hit and which delays the trial. We've made the argument that the statute which extends the statute of limitations for DNA related cases should not be applied in this case because this was pure negligence on the part of the police. It wasn't a new DNA test or was newly found DNA. I'll leave it at that and rely on the papers. But as a matter of due process, when you try somebody this long after the case, in this case his sister testified that she was unable to help to remember where he might have been on that day. And the reason the sister's testimony is key is because she lived with him. He was a juvenile at the time of the offense and she lived with him. She testified at trial. She was asked, can you tell the jury where he was on that day? She said, it's too long ago, I don't remember. You're raising a due process claim? Yes, sir. But not a speedy trial claim? Well, a speedy trial, my understanding is that a speedy trial applies after the indictment. In other words, a speedy trial applies to a trial. The trial has to be speedy from the point of the indictment. And from the point of the indictment to the date of trial, there was no speedy trial. No, but you're not raising a speedy trial. The short answer is you don't make a speedy trial claim, right? Correct, Your Honor. You just make a due process. Correct, because it was pre-indictment delay. It's the delay from the time of the offense. Due process on pre-indictment delay. Yes, sir. It's the delay from the date of the offense, which is February of 2007. Is that your best issue? There's a Commerce Clause issue also. On the delay, I think that's the best issue, Your Honor. All right. What's your very best issue? Well, I believe there's insufficient evidence on Commerce Clause. Insufficient evidence on the jurisdictional? Yes, sir. On the jurisdiction. So you're saying that your best contention is lack of jurisdiction. Yes, sir. If this is not a federal case, that the federal prosecutors didn't have any business in federalizing this case. It's a state court case. Absolutely. There you go. I've got your pen down here now. Insufficient evidence on jurisdiction. This was a robbery. It's a state garden variety state case. The government tried to make it into a MS-13. They tried to federalize everything. Yes, sir. That's it. They tried to federalize everything. This was a garden variety crime. The eyewitness, there was an eyewitness to the crime, to the supposed robbery. She testified for two days. She never once identified our client. The only evidence that attaches my client to this crime is that there's some DNA on a knife sheet. And that's the DNA that doesn't get tested for years. Some DNA on the knife sheet. Well, what's wrong with that? Well, the problem was that the crime... I mean, that all goes to the evidence. I mean, they tested it and implicated your client. That's tough. The problem was that the crime scene was tampered with. Well, you bring that up at the trial. That's an issue for the jury. All that kind of stuff. I mean, that's what that's for. The point of the... I'm going to the Commerce Clause issue. That is, there's no evidence. No one comes in and says, unlike other cases before this court on Commerce Clause, where drug traffickers were robbed and there's evidence that they targeted the drug traffickers because they knew that the drug traffickers had money. There's no evidence of that in this case. But they robbed a business. And part of the premise of the business, as I understand, is that women would come in from out of state to work there. I mean, how is that not enough of a nexus to interstate commerce? They robbed an ongoing business concern. They robbed people who were inside an apartment. What about Taylor? Taylor talks about... Taylor involves drug trafficking, over which the federal government has asserted jurisdiction. During a home robbery of drug dealers. Yes, but... The people that lived in the house were drug dealers, but there were robberies. Yes, but... Just going into their home. But in Taylor, the Supreme Court said that because drug trafficking... Because the federal government has passed extensive federal criminal laws for drug trafficking. Drug trafficking is definitely a type of business over which there's federal jurisdiction. But it explicitly said that it was making no decision as to other types of businesses. Congress, under the Mann Act, regulates interstate sex crimes, right? It regulates the kidnapping of women. Congress has come into the area here just as it did with drug trafficking. It legislates a very narrow area. The Mann Act is very narrow. You have to take a woman and transport her across state lines. Which is what they did here. No, they didn't. Well, they should have put her on a bus and sent her to Maryland. She voluntarily entered... Well, but the Mann Act... The Mann Act doesn't have to be involuntary. Mann Act is the involuntary transportation for women across state lines. It's causing interstate transportation for illicit purposes, immoral purposes. Like I said, immoral. But the crime is the taking of the woman across state lines by the defendant. Taking a woman across state lines is what they did here. But they prosecuted this one as a Hobbs Act. But the defendants... They prosecuted this one as a Hobbs Act. The defendants had nothing to do with the transportation of the woman across state lines. But it's the business. The business is engaged in interstate commerce. Interstate commerce involving women engaged in prostitution activities, traveling and interstate commerce to do that. It's a business. That's what the government's theory is. I don't want to be arguing it for them. Maybe if she gets up here, I'll argue it on your side. Well, Taylor explicitly said, the Supreme Court case in Taylor explicitly said, that we're not resolving what the government must prove to establish Hobbs Act robbery where some other type of business or victim is targeted. I understand that Taylor said that. But I guess my question is, why doesn't it follow? They haven't gotten there yet. But why doesn't it follow pretty straightforwardly from Taylor that prostitution, like drug dealing, is a commercial activity over which Congress has asserted some jurisdiction? Well, I submit to you that the Mann Act is different in scope than the federal regulation of drug cases. That's one reason. The other reason is that there's no evidence here that these gentlemen were robbing a brothel. There's no testimony from an accomplice as there has been in other cases where this court, in Taylor, before this court, the Fourth Circuit case Taylor, there was testimony that said, we're targeting the drug traffickers because we know they have money. There is no such evidence in this case. Of what? That the defendant and his accomplice entered the apartment for the purpose of robbing, targeted this apartment for the purpose of robbing a brothel. Is that an element? They wanted to rob generally. Correct. Whatever they did, the evidence. The evidence was they committed a robbery. Exactly. They accomplished it. They completed it. They did it. Nothing was taken. But it's a conspiracy charge, so nothing was taken. In fact, nothing was taken. So all your cases, you've got two issues. One's a due process claim and one's a jurisdiction claim. I have a lot of issues. I'm not abandoning any of them. But those are the issues that the court wants to. Those are your best ones. I think that the introduction of the DNA evidence, the DNA evidence should not have been introduced because it was tainted. The crime scene was intentionally tampered with by the people who ran the brothel. That is, they came in, they cleaned up. We don't know. The police did not arrive until a day later. The apartment was empty. The apartment was unlocked. And the victim, the person who had been killed, was lying outside the apartment on the ground outside the window. Next to the trash can or something. Something like that. And it was clear. The wife who came looking for him. Yes, sir. It was clear that the blood had been wiped down and all sorts of things. So the evidence had been tampered with. And then there's this knife sheath on a table. And then there's some DNA evidence. Then a jailhouse snitch four years later claims to have overheard a conversation where my client told someone in the middle of a jail through locked doors that he had committed this robbery. And you're saying the prosecutor should have walked away from this case? I'm saying it's a state case. Obviously, the state wasn't going to prosecute this case. They've got a federal hook to it. That's what the law is. They can do it. I don't think that there's sufficient interstate commerce under the substantially enforced law. Judge Michael wrote a dissent here one time that took the position you're arguing, I think. And he did a wonderful job with it. The interstate commerce hook was buying electric power or something off the grid. And he didn't think that was enough of a hook to get a Hobbs Act. And he did a good job with it. That's what you're trying to do. That's not the law of the circuit or the country. They don't have any authority to change it. I don't think that Taylor, the Supreme Court case in Taylor, which is an appeal from this court, still says that there has to be a substantial effect on interstate commerce. And I don't think that the evidence in this case supports that there was a substantial effect on interstate commerce. First, there was nothing. I thought it was just a minimal effect and then aggregated. You get a substantial effect. It's not like they have to show that the robbery of this particular raffle had a substantial impact on it. Correct. If the commerce and the aggregate. But that's what I'm saying. Taylor specifically said, we're saying these targeted thefts of drug dealers is sufficient for the Taylor effect  exerts a substantial jurisdiction over drug trafficking. That's why, and as I said, it expressly said that the ruling in Taylor did not apply to all businesses, that it would have to be decided on a case-by-case basis. What the government must prove to establish hopsack robbery where some other type of business or victim is targeted, we leave for another day. The test that it applied in Taylor and that it was willing to accept in Taylor was because it believed that drug trafficking as a business enterprise is one where Congress has determined there's interstate effect. But I'm submitting to the court that this robbery of an apartment, which turned out to be a brothel, without any evidence that they targeted it for that purpose because it was a brothel, which was the fact... I think we understand that argument. Okay. Do you have another argument? Yes, Your Honor. The closing argument. As I say, this was a case with scant evidence. And yet the government in rebuttal tried to... My argument is try to bolster the testimony of the jailhouse snitch by explaining that the reason they hadn't interviewed the supposed person that my client had spoken to was because it was dangerous to interview him because they would have found out that he was cooperating and other things. That was not... They went outside the record. Yes, sir. And explained why they hadn't called somebody to testify. Or why they hadn't even interviewed somebody. And they probably shouldn't have done it. And this was in rebuttal, and this is the argument. That might be the best issue you got. Well, let me talk about that. That they shouldn't have done it. And... They should have known better.  who supposedly was raped during the course of the robbery, identifies a co-defendant as the person who raped her. He pleads guilty. And then at trial, the government argues that my client is the rapist. I argue that that's a violation of due process that they took into consideration. You're trying to make a constitutional claim out of everything. And you're going to have a hard time getting the constitutional claims. We don't decide everything on constitutional issues. Well, they have a... But the improper argument about going beyond the record to explain what they hadn't done in their investigation or why they hadn't called a witness might be something they shouldn't have done. Especially because I... That doesn't make it a violation of the Constitution. Well, according to this court, it's a due process violation when the government does that. Particularly when that question had been put to the police officer on the stand during my cross-examination. And the court had been allowing the government to stand up and rebut after my cross-examination. And they never questioned the police. They had the opportunity to question the police officer on that point. And they never questioned him. And then on rebuttal, when I had no opportunity to rebut. And this is a case where... Did you object? Yes. You objected to the argument? Yes. What did the judge say? I believe I objected. Pardon? I'm hesitating because I'm not 100% sure. Did he sustain your objection or overrule it? I don't want to misrepresent the record. I'm not 100% sure. You're not sure whether you objected or not? Correct. If you didn't object, then it's reviewed for plain error. Correct. Okay. Well, she can tell us whether it was or not. I apologize. I just don't want to misstate the record. That red light's on anyway.  You can come back for rebuttal. Thank you very much. Thank you, Your Honor. Ms. Harris, you're no kin to Judge Harris. No, Your Honor. Okay. I just wanted to lay that out. May it please the Court, Amanda Harris on behalf of the United States. As you all have suggested, there are a lot of issues, so I'll just try to focus on the ones that we discussed this morning. Maybe you can talk about the last issue first, because I remember it. Yes, Your Honor. As an initial matter, there was no contemporaneous objection to the prosecutor's summary about why it did not call Mr. Argueta. That issue was raised after trial, but it was not preserved as an objection. So it's here on plain error review? Yes, Your Honor. And so the defendant would have the burden of establishing that it was error and that it was plain. You concede it was error? No, Your Honor. And you can say it's harmless? Is that what you're saying? I would say both. I don't think it's improper, Your Honor, because there was evidence by the confidential witness who testified that MS-13 retaliates against people who cooperate with law enforcement, including himself, who was a member of MS-13 at the time, that by testifying he was placing himself in danger. And so it seemed to me that it was improper argument. That was my impression from reading it, but there was no objection. And so it's here on plain error? Correct, Your Honor. And there was plenty of evidence that the government probably ought to be arguing harmless error and tell the prosecutors they ought to be careful doing this kind of stuff. Your Honor, assuming that it is improper argument is that it's harmless error, there's a number of factors, as Your Honor is aware, that the court considers. And one of those factors is whether it was invited by defense counsel, which it was. In this case, defense counsel brought up the fact that the government hadn't interviewed Mr. Argueta, and so the government was attempting to address that issue. It didn't have any tendency to mislead the jury either because of the prior testimony about the sort of dangers of testifying as it relates to MS-13. There was no curative instruction, but, of course, there was no objection, so there wasn't really an opportunity for curative instruction to be given. Sometimes judges will stop it themselves if they pick up on it. Yes, Your Honor, that didn't occur in this case, but I don't think it was so shocking that it warranted an instruction sort of sua sponte. Were you a trial lawyer? No, Your Honor, I was not. But looking at all of the factors that this court considers, as well as looking at the totality of the case, these were pretty stray remarks. The prosecutor's closing argument lasted about 38 pages, and this was sort of a couple lines among all of that. It wasn't on a rebuttal closing. I've been heard. It was during the regular prosecutor's closing. It was during the rebuttal. The prosecutor was rebuttal. Yes, Your Honor. That was 38 pages? No, I'm sorry. But total, I'm sorry.  The rebuttal was brief. The rebuttal was fairly brief, Your Honor, but just considering the totality of what the argument was from the prosecution, this wasn't sort of the main theory of the case. It was just sort of a stray comment to respond to defense counsel's argument. Stray comment, defense. That's your stray comment explanation. Yes, Your Honor. Even if it were improper, it didn't so prejudice the defendant that he was not entitled or did not receive a fair trial. I think that's the standard. And it's also his burden, which I do not think that he has met. With regard to the interstate commerce element, I'll just briefly address that. I think there is an appropriate analogy between the Mann Act and Congress's ability to regulate drugs. But I'd also say that this case involved more than was present in Taylor with regards to an interstate commerce hook. In Taylor, there wasn't really evidence that the drugs themselves had gone through the channels of interstate commerce or even that the drug dealer himself was engaged in interstate commerce. The government sort of proceeded on a theory that drugs generally are always in interstate commerce. In this case, we have a business, just like any other business, which was engaged in interstate commerce. And there was plenty of testimony from Ms. Garcia. The Mann Act doesn't involve a kidnapping. It doesn't have to be a kidnapping. No, Your Honor. That's what she said. No, Your Honor, it doesn't. It's just interstate commerce for an immoral purpose. Correct, Your Honor. Did her still say immoral? I wouldn't be able to say that with 100% certainty, so I don't want to make a representation on that. But this case, even putting the Mann Act aside, should be treated like any other business. The brothel itself had a strong interstate commerce engagement, including the women who were providing the services traveling from New York to Maryland to work in the brothel. And the testimony was that even the brothel owner was going to pick up this victim from the bus stop. So it wasn't just sort of like employees happened to be from out of state. They were actually sort of solicited and brought over. Additionally, Your Honor, there were condoms that were bought and sold. The testimony at trial was that those condoms also traveled in interstate commerce and were not manufactured in Maryland. So I think this case, even on its facts, has more of an interstate commerce hook than the facts of Taylor. And is there evidence that the theory of the case that the brothel was targeted for its proceeds? I think, yes, and also it was sort of a depletion of assets theory that, although perhaps not successful in this case, the instruction was either attempt to end conspiracy. But there have been multiple cases that I think the government cited in our brief that so long as the business itself is engaged in interstate commerce I just don't remember this fact. I sort of understood your colleague to be arguing they didn't even know it was a brothel. They just thought they were robbing a plain old apartment. But did you all show that, no, they were there to rob a business? Your Honor, I think from Ms. Garcia's testimony, they sort of immediately came in and were demanding money. There was a doorman who was working at the brothel. I think it was pretty clear that this was a business. There was also testimony that that area of town often operated sort of illegal businesses, even sort of restaurants, things that necessarily wouldn't be illegal if they had the proper permits. And so the people who lived in the area knew that these businesses were there and that's what these two defendants were doing. Where is this located? It's near Greenbelt. It's Langley Park, Maryland. Not the courthouse. Not the courthouse, but near Greenbelt. It is Langley Park, although I haven't visited there myself. But I understand it's fairly close to Greenbelt. Is that Montgomery County? I think it's Prince George's County, Your Honor. Why did it take so long to test the knife sheath for DNA? I do understand why it wasn't in the first five things. But when you got the first five back, just send out the knife sheath. Your Honor, initially when Prince George's County sort of gathered all of the evidence from the crime scene, there was a problem with the actual laboratory that was Prince George's County's laboratory. They were not able and accredited to test their own items, and so the items had to be sent off for testing. Jessica Chark, who was working at the lab at the time, testified that it was sort of a triage process based on a lack of resources, that they sort of had to pick five. I get it. So you had to pick five things and send them. But when those five things came back, why couldn't you then send the knife sheath instead of waiting several years? That's what I'm not understanding. Your Honor, at the time, they followed up on the identifications that Ms. Garcia had made. They submitted additional DNA from suspects. They weren't getting any hits, and essentially it just kind of became a cold case because there wasn't a great eyewitness identification. I read your brief. I understand that. I guess I have more curiosity maybe than anything else. I don't get it. Why did you let it become a cold case? Why not send in the other evidence you have for DNA testing? I think, Your Honor, my understanding of the case has been it is a resource problem. It's not just that you could only send five things at a time. It was that you could only send five things, period. I think it was just at the time, initially they could only afford to send five things because they were going to a private laboratory. And after following up over the course of the year or so on the leads that they had, they were unable to identify a suspect,  They just forgot about it. Yes, Your Honor. Was it a resource problem in the U.S. Attorney's Office? Your Honor, the U.S. Attorney's Office didn't get involved until there was a CODIS hit on Mr. Lopez's codefendant, Mr. Ceres Cruz, in 2011. So when you all got it, you acted on it promptly? Yes, Your Honor. As soon as there was a hit for Mr. Ceres Cruz, that's when the government decided to go ahead and submit additional items for DNA testing. And that's when the knife was put in? Yes, Your Honor. So late 2011 was when the knife sheath was submitted for testing. I'm not really sure why there was a little bit of lag time. You still didn't indict it until July of 2013? Between the time that Mr. Lopez was a suspect, which was April 23, 2012, which was the date of the CODIS hit, and the time of the indictment, which was in July of 2015, I mean, I'm sorry, 13. 13. That was about a year. And the reason for that was just sort of ordinary investigation to make sure that the government could corroborate this hit between the DNA and Mr. Lopez. And that's when the government was able to speak with a confidential witness who was able to corroborate the DNA hit. Is it important to your case that we find that the government was not negligent in failing to test the knife sooner? Would it matter if the government were negligent? Would that affect either the tolling statute or the due process claim? I don't think it affects either. I'll take them sort of in order. With regard to the tolling statute, the language of the statute itself, as well as the sort of statutory legislative history that surrounds it, doesn't seem to contemplate any government conduct in any regard, whether it's negligent or reckless or anything else. And I think that the only court addressing this in the Seventh Circuit in Hagler did not contemplate sort of the government's behavior when it reached a decision. With regard to due process, the government's conduct is a consideration, assuming first that the defendant shows actual prejudice. Our position is that as the district court found, the defendant hasn't shown actual prejudice. But even assuming that he did show some sort of prejudice, this court and the Supreme Court and Marion and other cases have said that it's something more than just negligence. It has to be something that the government is trying to gain tactical advantage or sort of misconduct. And there's certainly no evidence in this case. But even if sort of negligence was enough, the district court in this case never found that the government was negligent, that once it got a lead it sort of was trying to follow up in a timely prosecute case. I'm thinking of the right cases. This is the case of the Juvenile Delinquency Act claim, right? Yes, Your Honor. Just one quick question about that. Sure, Your Honor. What's the rule you want us to announce on the constitutionality of the 21-year cutoff? What if there were evidence that the prosecutor, and you're saying there wasn't any such evidence here, everything you need with appropriate dispatch, but if there were evidence that a prosecutor purposefully held off on charging someone until just after their 21st birthday, would that be okay? Under due process, Your Honor? The only court that I'm aware of that has addressed that case is in the Hu case from the Second Circuit, and they said that sort of the prosecutor's decision of when to prosecute doesn't create a due process violation. I thought you were going somewhere else. I thought the Second Circuit specifically reserved that question and said if there were improper prosecutorial motive, that's a different question. We're reserving that one. Yeah, I think that's what you want us to do. I think the same could be true here, because there was no evidence that the government was sort of sitting on its hands until Mr. Lopez turned 21 a day, that that issue isn't really before the court, and it may be a different situation. They'd bring that up on 2255. I don't think in this case, Your Honor. No, but normally you would, rather than on a direct appeal. Well, if you had evidence. I think you could bring it up on either, but here I think he's addressed it on direct appeal, but I just don't think that the evidence supports his claim. If the court has no further questions, the government respectfully requests that this court affirm. Your Honor, the issue on the DNA evidence, I believe the government misstates the record. The problem with the lab was that they would only test five items, but the testimony at trial was that they submitted 41 items to the DNA lab in March of 2007. Shortly after they collected, they submitted 41 items, and they never explained why the knife sheath was not among the 41. It is true that they only tested five at that point, and the only testimony was that they only tested five because they had this issue, their lab was messed up, and they were sending items out to be tested at a private lab. But the testimony, and this is at page 12 of my opening brief, the testimony was that in 2007, I believe it was February 28, 2007, the police collect the evidence March 1, 2007. March 14, they send 41 items, but not the knife sheath. So where does this go? It goes to negligence on the part of the government, and I think that the due process argument is if the defendant can show prejudice in the delay, the pre-indictment delay. So what's your prejudice? My prejudice is that when he gets charged six and a half years after the offense and tried eight years later, his sister cannot vouch for him. He was a juvenile at the time. He's living with his sister. She testified she could not remember. Neither he nor her could remember where he had been on February 28, 2007. His DNA is collected in 2008, so it's in the system in 2008. They don't send the knife sheath. They never explain it. When he sends it over to the lab in 2011, November 2011, the officer sends it over to the lab. When he gets to the lab, it's got a stain on it. And we know that because there's an e-mail or a text message between the lab and the officer and says, there's a stain on this, and he says, I don't know where the stain came from. So this is the only real evidence of his participation. They've never explained why this – I thought the government represented that there was a hit separate and apart from the gunshot. No, no. No, that didn't happen. The only DNA – they supposedly tied the guys up with electrical cords. His DNA was not on there. There was a knife that was partially stuck in the victim. His DNA was not on there. There was blood all over the place. And there's DNA of several other people on the knife that was the murder weapon. This is just an empty knife sheath that this prostitute claims that the person who raped her had a knife similar to this. But the point is – How did they get to your point? The knife sheath goes to the DNA lab. There's a hit – And before that, there's no connection of your client. The knife sheath goes to the DNA lab. His DNA is in the system in 2008 because he's arrested on something unrelated to this. In 2011, the officer all of a sudden sends this knife sheath over. For no reason? Without explanation. He testified on the stand. He never explained why it was sitting wherever it was for four years. And your client had not been at all connected to this prostitute? No one. Because the prostitute had picked out the person she claimed raped her and picked out the other defendant who ended up pleading. And she said at the time she was very confident because she'd never forget his mouth. So he had never been implicated at all by any eyewitness or anyone else. So then the hit comes back in 2012. Then they go to the jailhouse snitch and he says, oh yeah, he'd been cooperating at that point for some time and never mentioned my client. And my time is up, I see. Or I have seven seconds. I think that my colleague on the chair has a question. But the details of how the DNA is related. That seven seconds is beyond the red light coming on. Oh, I'm sorry. It keeps counting and tells you how late you are. I apologize. I think we understand. The date sequence is at page 12 of the opening brief on the DNA. Thank you very much. We will ask our clerk to adjourn court and then we'll come down and greet the board. I understand that. And as we understand that you're put on, we very much appreciate your service. This is the fourth day of adjournment. Signing off, God save the United States and this conference is adjourned.
judges: Diana Gribbon Motz, Robert B. King, Pamela A. Harris